UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

01 FEB 26 AM 10:14

U.D. OF ALABAMA

| | | |
|---|---|---|
| BECKY WARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV 98-S-2460-NE |
| | ) | |
| STEELCASE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

FEB 2 6 2001

| | | |
|---|---|---|
| BECKY WARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV 99-S-0654-NE |
| | ) | |
| MARTIN PLANT SERVICES, f/d/b/a) | | |
| MARTIN SUPPLY CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The first of these consolidated cases, CV-98-S-2460-NE, was filed against Steelcase, Inc. ("Steelcase"), a manufacturer of office furniture and fixtures headquartered in Grand Rapids, Michigan. The company operates a plant in Athens, Alabama, producing such items as office cubicles, cabinets, binder bins, and paper flow trays. In that action, plaintiff Becky Ward asserts that, while employed by Martin Supply Co., Inc. ("Martin") as on-site manager of a so-called "tool and supply crib" located within Steelcase's Athens plant, she was subjected to a sexually hostile



work environment by a Steelcase maintenance employee. She further alleges that Steelcase effectively demoted her when one of its managers requested Martin's Vice President to transfer her from the Athens plant, and replace her with a male.

Approximately six months after the first action was filed, plaintiff filed the second, CV-99-S-654-NE, but this time she sued Martin, her employer-in-fact. In that complaint she again asserts claims of a hostile work environment and a discriminatory demotion, premised upon the same facts alleged in her first complaint against Steelcase.

In both cases, plaintiff alleges that each defendant's conduct violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

The cases were consolidated on May 21, 1999.[1] The actions now are before the court on Steelcase's motion for summary judgment (doc. no. 37), and, plaintiff's motion for partial summary judgment against both defendants (doc. no. 38). Upon consideration of the motions, pleadings, evidentiary submissions, and briefs, this court concludes that Steelcase's motion is due to be granted, and plaintiff's motion denied.

---

[1] The order of consolidation was entered as document number 10 in CV-98-S-2460-NE (Steelcase file), and as document number 6 in CV-99-S-0654-NE (Martin file).

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally id.* at 323, 106 S.Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-movant's case. *Jeffery v. Sarasota*

3

*White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex Corporation*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593. The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely

4

colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

When presented cross motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may

be entered in accordance with the Rule 56 standard." 10A Wright,
Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2720;
*see also, e.g., Arnold v. United States Postal Service*, 649 F.
Supp. 676, 678 (D. D.C. 1986) (Richey, J.). The court is required
to "relate all material facts in genuine dispute in the light most
favorable to the party resisting summary judgment." *Serrano-Cruz
v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 24 (1st Cir. 1997) (citing
*Sanchez v. Alvarado*, 101 F.3d 223, 225 n.1 (1st Cir. 1996)).

## II. STATEMENT OF FACTS[2]

### A.   The Relationship Between Steelcase and Martin

Plaintiff alleges that she was jointly employed by Steelcase
and Martin. It accordingly is necessary to understand the
connection between the defendants, and, their respective linkages
to the plaintiff.

Martin is a wholesale distributor of industrial supplies
headquartered in Sheffield, Alabama. The company has 17 offices
located in the states of Alabama, Tennessee, and Mississippi. Its
activities are divided among three divisions: Martin Industrial
Supply, which sells industrial supplies to the general public at

---

[2] The facts stated here are either undisputed or set forth in a light most
favorable to plaintiff. In section III. B. of this opinion, where the court
addresses plaintiff's motion for partial summary judgment, the court considers
the facts in a light most favorable to Martin, the non-moving party.

retail[3]; the so-called Construction Product Group, which sells hardware supplies, primarily to those in the construction industry; and Martin Plant Services, which provides on-site storeroom operations to several large manufacturing operations, such as Boeing, Caterpillar, Minnesota Mining & Manufacturing Company, Delphi-Harrison, and Steelcase.[4]

Defendants executed a "memorandum of understanding" on September 30, 1992, designating Martin as sole source supplier for certain maintenance, repair, and operational supplies required in the manufacturing processes conducted at Steelcase's Athens plant.[5] Martin initially serviced Steelcase from its facility in Decatur, Alabama, approximately 30 miles from Athens.[6]  It became apparent that the distance between the two facilities impaired Martin's ability to effectively service Steelcase.  Defendants consequently agreed during February of 1993 that Martin would purchase and receive supplies on-site, from a "tool and supply crib" located

---

[3] Plaintiff's evidentiary submission (doc. no. 41), Exhibit 2 (Ruggles deposition), at 11-15.

[4] Id.

[5] Id. Exhibit 15 (Memorandum of understanding), at Bates Stamp page # D00073.

[6] Id. at Bates Stamp page # D00074, providing in pertinent part (under the heading "STAFFING") that Martin "personnel will handle the [maintenance, repair, and operation supply functions of] buying, receiving, and delivery to [Steelcase] from its remote location [i.e., Decatur]."

7

within the Steelcase plant.[7]  Plaintiff was assigned by Martin to
perform its buying and receiving functions from that location.[8]
Steelcase assigned two employees to work with her in the crib, and
perform all other duties.  Despite this change in operating
procedures, there was no formal, written amendment to the parties'
contract at that time.[9]

On March 21, 1994, however, defendants executed a "memorandum
of agreement," expressly "superced[ing] that certain Memorandum of
Understanding entered into between the parties dated September 30,
1992."[10]  That agreement designated Martin "as the owner/operator
of an MRO (Maintenance, Repair, and Operation) tool and supply crib
to be located within the manufacturing plant owned by [Steelcase],"
and, "outline[d] the procedures by which [Martin] will assume the
inventory, staffing, and operation of the MRO crib currently owned
and operated by [Steelcase]."[11]  Under the heading of "Staffing,"
the agreement provided:

A.    [Martin] will staff the crib on [Steelcase's] First
and Third Shifts, Monday through Friday, and on

---

[7] *Id.* Exhibit 2 (Ruggles deposition), at 30.

[8] *Id.* Exhibit 6 (Young deposition), at 10, 12, 17, 47.  Plaintiff testified
that, initially, she was the only Martin employee working at the Steelcase
facility.  *Id.* Exhibit 1 (plaintiff deposition), at 75.

[9] *Id.* Exhibit 6 (Young deposition) at 45-47.

[10] *Id.* Exhibit 15 (Memorandum of agreement), ¶ 1, at Bates Stamp page #
D00114.

[11] *Id.*

Saturday as required by [Steelcase].

B.    [Martin] staff will consist of
    1.    1 Contract Manager
    2.    1 Buyer
    3.    1 Crib Coordinator
    4.    2 multi-purpose employees.[12]

In other words, all persons working within the tool and supply crib

owned and operated by Martin were to be employees of Martin.    In

exchange, Steelcase agreed to pay Martin:

A.    Maximum of 16% margin, plus shipping costs on non-
stock items.  This payment to satisfy the costs of
staffing the crib with 2.5 people as described in
paragraph 6B [the "Staffing" provision].

B.    An annualized contract fee of $62,500, or $25,000
per employee, for the 2.5 additional people as
described in paragraph 6B above [the "Staffing"
provision].  Payment for the contract fee will be
made to [Martin] by Steelcase at the rate of
$5,208.33 per month. [[13]]

Diane Young, a Steelcase buyer who assisted in negotiating the on-

site supply crib arrangement with Martin explained "that money

would be paid to Martin Supply so that they could use it to pay the

salaries" of half ("2.5") of the five Martin employees working in

---

[12] *Id.* ¶ 6, at Bates Stamp page # D00115.  Among other things, Martin also agreed to:  develop a format for purchasing and managing the crib's inventory; stock supplies at a reasonable level; carry insurance on its employees and inventory; guarantee annual net price reduction savings to Steelcase; make the prices of stock items available to Steelcase in the form of a priced catalog; and, provide non-stock items subject to a maximum 16% margin, plus shipping charges.  *Id.* ¶ 7.

[13] *Id.* ¶ 8. $25,000 per employee x 2.5 employees = $62,500 annually ÷ 12 months = $5,208.33 each month.

the crib.[14]  Young further said that the annual payment of contract fees by Steelcase was intended to compensate Martin for not only the additional crib employees, but also Martin's "overhead, profit margin, ... [and] the whole cost of doing business" from the remote site within the Steelcase plant.[15]  Martin, alone, determined the salaries paid its crib employees.[16]

## B.    Plaintiff's Relationship with Steelcase and Martin

Plaintiff was hired by Martin to fill the position of manager during October of 1992.[17]  At that time, Martin was still providing service to Steelcase from its facility in Decatur, Alabama. Plaintiff consequently performed her duties there.  She assisted in the distribution of supplies to the Steelcase plant.  She remained at Martin's Decatur facility until early 1993, when she was assigned to work on-site, at the Martin supply crib located within Steelcase's Athens plant.[18]

---

[14] *Id.* Exhibit 6 (Young deposition), at 25-26.

[15] *Id.* at 27-28.  Young's testimony is supported by a purchase order for a monthly payment under the contract.  The description of the payment stated that it represented the "[a]nnual fee for contract labor provided by Seller for operation and maintenance of Maintenance, Repair, and Operations supply crib owned by Seller and located at buyer's manufacturing facility."  *Id.* Exhibit 16 (Purchase order).

[16] *Id.* Exhibit 6 (Young deposition), at 25 ("What [Martin] did with that [money] in payment of their crib salaries was their affair, not ours."); *see also id.*, Exhibit 2 (Ruggles deposition), at 34 ("[W]hat we paid [our crib employees] was determined by us.").

[17] *Id.* Exhibit 17 (application for employment).

[18] *Id.* Exhibit 1 (Plaintiff deposition), at 65.

Plaintiff enjoyed much freedom in the manner she performed her duties after transferring to the Steelcase plant.  She said "[a]ny decision, except money decisions, were mine to make as far as a request or demand from Steelcase."[19]  For example, "[i]f [Steelcase] requested more employees I was allowed to agree to that and then contact Doug [Ruggles, Martin's Vice President] and tell him that we were adding shifts or whatever."  She had complete discretion to conduct research on vendors and offer lower prices to Steelcase. Plaintiff also implemented special projects without assistance or direction.  When Steelcase requested that Martin implement a bar-coding system, plaintiff did so.[20]  Plaintiff testified that she "enjoyed" working in the Martin supply crib within the Steelcase plant.[21]  Undoubtedly, the freedom and discretion she exercised there contributed to her attitude.

Even though she worked within the environs of the Steelcase manufacturing facility, plaintiff still received her performance evaluations from Martin's Vice President, Doug Ruggles.[22]  The ability of Steelcase to influence her performance appraisals was, at best, informal and tangential.  Ruggles testified that he would

---

[19] *Id.* at 433.

[20] *Id.* at 436-438.

[21] *Id.* at 492.

[22] *Id.* at 408, 423-424.

"just ask [Steelcase management officials general questions, such as] 'How are we doing?  What areas do we need to improve on?'  But I never went to them and said, 'I am about to do an evaluation on one of my employees, give me your input.'"[23]

Despite the fact that Martin determined plaintiff's rate of pay, the company did not directly issue paychecks to her.  Martin instead leased several of its employees, including plaintiff, from an employee leasing agency named "Skilstaf, Incorporated."  As such, plaintiff received her paychecks, W-2 tax forms, and health insurance from Skilstaf, not Martin.[24]

Sandra Locke, a Steelcase human resource manager, provided undisputed testimony about the relationship between Steelcase and its employees.  She testified that new employees undergo an "extensive orientation," during which

> [a] Steelcase human resources representative will review a variety of subjects from Steelcase's Employee Handbook ... including its EEO, Diversity, and Harassment Prevention policies, its Positive Discipline System Policy, and the policies regarding vacations, holidays, and counseling.  For Steelcase employees, a Steelcase human resource representative [also] will explain matters such as insurance, retirement, and tax information. [25]

These matters were never discussed with plaintiff by any Steelcase

---

[23] *Id.* Exhibit 2 (Ruggles deposition), at 44.

[24] *Id.* Exhibit 1 (Plaintiff deposition), at 406, 421-422.

[25] Defendant's evidentiary submission (doc. no. 40), Exhibit 7 (Locke affidavit), ¶ 8.

human resource representatives.[26]

Locke also testified that, unlike plaintiff — who was evaluated, and had her salary determined, by Martin management — "Steelcase employees are subject to day-to-day supervision by other Steelcase employees, receive periodic performance reviews [by Steelcase management], and are given information by Steelcase human resources on pay rates and potential increases."[27]

Plaintiff nevertheless asserts that Steelcase controlled the terms and conditions of her employment in two ways: by dictating the hours of work; and by requiring that plaintiff request permission from Steelcase managers before leaving the premises.[28]

C.   **The Alleged Harassment**

Very soon after plaintiff was assigned to work in the Martin supply crib at the Steelcase plant, Darryl Long, a Steelcase maintenance man with no supervisory authority over any other Steelcase employees, much less the plaintiff, began making chauvinist comments.[29]   Contact between plaintiff and Long was

---

[26] *Id.* ¶ 10.

[27] *Id.* ¶ 9.

[28] Plaintiff's evidentiary submission (doc. no. 41), Exhibit 1 (plaintiff deposition), at 432-434.  Steelcase argues that while the contract existing between it and Martin did stipulate the shifts during which the crib would be staffed, it did not specify plaintiff's individual work hours.  Instead, Steelcase contends that Martin was responsible for supervising plaintiff's work, scheduling her hours, and monitoring her performance.  Defendant's evidentiary submission (doc. no. 40), Exhibit 6 (Shellnut affidavit), ¶ 4.

[29] Plaintiff's evidentiary submission (doc. no. 41), Exhibit 1 (plaintiff's

unavoidable, because they worked in close proximity to one another. Long's work space, which plaintiff described as "just an open maintenance area," was located directly in front of the Martin crib.[30] In addition, it can be gleaned from the record that members of Steelcase's maintenance staff would come into contact with Martin employees when obtaining or ordering items from the supply crib.[31]

The first incident of harassment occurred in February or March of 1993 and, according to plaintiff, it was the "the most dramatic."[32] Long told her she "was taking the job [in the crib] away from a man," and that she "belonged at home." Long also stated, "what [is] wrong with the world today ... is ... women [are] trying to take the world over."[33] Steelcase employee Donnie Malone overheard a similar exchange: Long told plaintiff "women should be at home, bare feet and pregnant."[34] Malone also testified

---

deposition), at 232. After plaintiff was transferred from the Steelcase facility in January of 1998, Long was promoted to the position of assistant supervisor of maintenance, in which position he supervised approximately 24 employees. *Id.* Exhibit 14 (Long deposition), at 15-20. Long left this supervisory position during the "fall of 1999," allegedly because he disliked the extensive paperwork required by the supervisory position. *Id.* at 17.

   [30] *Id.* Exhibit 1 (plaintiff deposition), at 217.

   [31] *Id.* at 214; *id.*, Exhibit 9 (Malone deposition), at 13.

   [32] *Id.* Exhibit 1 (plaintiff deposition), at 70.

   [33] *Id.* at 70-71.

   [34] *Id.* Exhibit 9 (Malone deposition), at 11. Malone could not estimate the date this comment was made.

that Long often told other Steelcase employees that women did not belong in the workplace.[35]   Long uttered similar sexist, gender slurs on a regular basis, throughout the period plaintiff worked within the Steelcase plant.[36]

Long engaged in other conduct that plaintiff perceived as sexual harassment.   For example, in April or May of 1995, after plaintiff's son had been arrested on criminal charges, Long asked her, "how can [you] manage a crib when [you can't] manage your own son?"[37]   Plaintiff insists this comment was related to her gender, because she "never heard him confront a male that way."[38]

In mid-1995, Long informed Jim Waybright, Steelcase's plant manager, that plaintiff had made "sexual advances" towards a co-employee named Ricky Christopher.[39]   An investigation into the matter did not establish that the accusation was true.[40]

During this same period of time, Long began "making a notebook of instances" which reflected times that Martin employees had

---

[35] *Id.* at 9.   Another Steelcase employee, Darryl Thompson, similarly testified that he has heard Long comment "a couple of times" that women generally, and plaintiff specifically, should not be working in the tool crib. *Id.* Exhibit 12 (Thompson deposition), at 9, 16.   Thompson could not estimate the specific dates these comments were made.

[36] *Id.* Exhibit 9 (Malone deposition), at 18; *id.* Exhibit 11 (Smith deposition), at 10-11; *id.* Exhibit 8 (Christopher deposition), at 15.

[37] *Id.* Exhibit 1 (plaintiff deposition), at 219.

[38] *Id.* at 220.

[39] *Id.* at 59-60.

[40] *Id.* Exhibit 7 (Hall II deposition), at 35.

15

failed to properly stock the crib with supplies.[41]   Plaintiff admitted that she never saw this notebook, but asserts that Long compiled it as "evidence" in an effort to "get rid of [her]."[42]

Plaintiff also complains about two attempts by Long to "discredit" her.  In the first, Long complained to his supervisor, Jerry Shindorf, that plaintiff "lied" to Steelcase welders when she denied having a needed item in stock.[43]  In the second incident, which occurred during the later part of 1996, Long reported a pricing error by a crib attendant.[44]  Plaintiff contends that Long went to the Steelcase comptroller, Jim Horner, pointed out the error, and exclaimed that it was an example of how plaintiff "lies."[45]  Plaintiff insists that these allegations were made by Long because he held a discriminatory animus toward women.[46]

In April of 1996, plaintiff attempted to show Long a copy of her daughter's engagement announcement and photograph from a local newspaper.   Long rebuffed her, saying he "didn't want to see

---

[41] *Id.* Exhibit 1 (plaintiff deposition), at 245.  Long encouraged a co-employee, Donnie Malone, to maintain a similar list.  Malone described the list as containing "cost savings as to what Martin was doing in the crib and how we could do it cheaper."  *Id.* Exhibit 9 (Malone deposition), at 14.  Malone eventually stopped working on the list, because he felt Long "had a problem with [plaintiff] and [he] didn't want to be in the middle of it."  *Id.*

[42] *Id.* Exhibit 1 (plaintiff deposition), at 245.

[43] *Id.* at 249-250.

[44] *Id.* at 254-256.

[45] *Id.*

[46] *Id.* at 252

16

nothing that has anything to do with you," and added insult to the injury of his first statement by remarking, "beauty is only skin deep."[47]

Another event occurred on an unspecified date, when a Steelcase maintenance man assisted plaintiff in lifting a 55 gallon drum.  Long approached and said he "would not allow his men to help [plaintiff] anymore," and added, "if you're a woman and could not handle the job, go home."[48]

Long hinted to plaintiff on September 20, 1997, that she was about to be terminated or transferred:  "I just wanted you to know that you're gone."[49]  Long proceeded to tell plaintiff that "he was tired of having to pay his men seventeen to twenty dollars an hour to do [plaintiff's] job for [her]."[50] He also boasted that he would replace the crib staff with employees of his choosing after she was gone.  (It is undisputed, however, that Long had no supervisory responsibility or authority to hire anyone during this timeframe.[51])

No comments of any kind were made by Long during the last quarter of 1997.

---

[47] Id. at 221.
[48] Id. at 238.
[49] Id. at 229.
[50] Id.
[51] Id. at 232; see also supra note 29.

D.   **The Alleged Discriminatory Demotion**

Plaintiff was removed from her position within the Steelcase facility during January of 1998.  She was transferred to the Trico facility in Decatur by Martin's Vice President, Doug Ruggles.  At Trico, she "assist[ed] in ... implementation projects."[52]  Plaintiff contends the transfer constituted a demotion, and that it occurred because of her gender.  She bases the latter assertion on a statement attributed to Ruggles.  She says he told her that Greg Hall, a member of Steelcase management and the liaison between Martin and Steelcase, suggested that plaintiff be removed from the crib and replaced by a man.[53]  Plaintiff <u>was</u> replaced by a male, Michael Foreman.[54]

At Trico, plaintiff was classified as a buyer, which did

---

[52] *Id.* at 70, 91-95.

[53] *Id.* at 271, 278.  Hall denied ever saying this.  Instead, he admitted that in a conversation with Ruggles which occurred in January or February of 1996, he commented that, due to problems in the crib with inventory, pricing, and instances of perceived dishonesty by plaintiff, "a change in [crib] management might be in order to show that effort was going on to try to improve" crib performance.  Hall stated that at the time he made this comment, "there wasn't a good relationship ... between Martin and Steelcase."  *Id.* Exhibit 7 (Hall II deposition), at 59-62.
Ruggles also testified that Hall never said that plaintiff should be replaced by a male.  Ruggles said, instead, that in his "opinion," there were people at Steelcase who "would be happier with a man" holding plaintiff's position.  At his deposition, Ruggles did not explain the basis of this opinion, but did admit to making this statement directly to plaintiff.  He was unable, however, to recall the approximate date when he made this comment to plaintiff.  *Id.* Exhibit 2 (Ruggles deposition), at 86.

[54] *Id.* at 87.

constitute a demotion from her previous position of site manager.[55]
Even so, plaintiff initially retained the same salary she
previously had been paid as site manager of the Steelcase supply
crib.  Approximately one year after the transfer, however, her
annual salary was cut by approximately $7,000.[56]  The evidence
indicates that male Martin employees who suffered similar demotions
did not experience a reduction in pay.[57]

### III. DISCUSSION

**A.   Steelcase's Status as Joint Employer**

Title VII of the Civil Rights Act of 1964 declares that it is
"an unlawful employment practice for an employer to fail or refuse

---

[55] *Id.* at 94.  Ruggles testified:

Q.   Is that position considered a demotion from site manager?

A.   I would think they would not be considered on the same level.

Q.   Would it be a lower job than site manager?

A.   Yes.

Q.   And the compensation, what is the difference in the compensation?

A.   Specifically the hourly versus the salary part.  The specific numbers, I say it is probably $7,000 maybe.

Q.   Less as a buyer?

A.   Yes.

*Id.*

[56] *Id.* Exhibit 1 (plaintiff deposition), at 80-81.

[57] *Id.* Exhibit 2 (Ruggles deposition), at 95.  *See also, id.* Exhibit 5 (Cruse deposition), at 18-21.

to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, <u>sex</u>, or national origin."  42 U.S.C. § 2000e-2(a)(1) (emphasis added).

Sexual harassment is a form of sex discrimination prohibited by Title VII.  *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (holding that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment").

The Eleventh Circuit observed in *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982), that "Title VII prohibits employment discrimination on the basis of gender, and seeks to remove arbitrary barriers to sexual equality at the workplace with respect to 'compensation, terms, conditions, or privileges of employment.'" *Id.* at 901.

Before a district court may entertain a sexual harassment claim, however, the plaintiff must demonstrate that the defendant meets the statutory definition of "employer": a term that the Act defines as an individual or firm that is "engaged in an industry

affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person...."  42 U.S.C. § 2000e(b).

The Eleventh Circuit has characterized the issue of "whether a defendant meets the statutory definition of 'employer' as a threshold jurisdictional matter under Title VII...."  *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1340 (11th Cir. 1999) (*en banc*) (citing *Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, 1359 (11th Cir. 1994)).

The question most often confronting district courts when determining whether a plaintiff has established that the entity sued meets the statutory definition of "employer" is:  whether the defendant employed the requisite number of persons during the period prescribed by the statute?   When that threshold jurisdictional question is raised, plaintiffs sometimes attempt to add the number of persons working for some separate entity to the number of persons employed by the plaintiff's employer-in-fact. Such "tacking" or "aggregation" efforts have been addressed more than once within this circuit.  *See, e.g., Lyes*, 166 F.3d at 1340-47; *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244-45

21

(11th Cir. 1998); *Virgo*, 30 F.3d at 1359-61; *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987); *Williams v. City of Montgomery*, 742 F.2d 586, 588 (11th Cir. 1984). In such cases, the courts "sometimes look beyond the nominal independence of an entity and ask whether two or more ostensibly separate entities should be treated as a single, integrated enterprise when determining whether a plaintiff's 'employer' comes within the coverage of Title VII." *Lyes*, 166 F.3d at 1341. In that regard, the Eleventh Circuit has identified three circumstances in which it is appropriate to aggregate the number of persons employed by multiple entities, for the purpose of counting employees:

> First, where two ostensibly separate entities are "'highly integrated with respect to ownership and operations,'" we may count them together under Title VII. *McKenzie*, 834 F.2d at 933 (quoting *Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 726 (N.D. Ala.), *aff'd*, 664 F.2d 295 911th Cir. 1981)). This is the "single employer" or "integrated enterprise" test. Second, where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as "joint employers" and aggregate them. *See Virgo*, 30 F.3d at 1359-60. This is the "joint employer" test. Third, where an employer delegates sufficient control of some traditional rights over employees to a third party, we may treat the third party as an agent of the employer and aggregate the two when counting employees. *See Williams*, 742 F.2d at 589. This is the "agency" test. *See generally* 2 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 1309-17 (3rd ed. 1996).

*Lyes*, 166 F.3d at 1341.

In this case, however, it is not disputed that Martin and Steelcase, separately and severally, each employed fifteen or more persons during the period prescribed by the statute. Moreover, it is not disputed that <u>Martin</u> was plaintiff's employer-in-fact. Rather, the question that is raised by both motions for summary judgment is whether <u>Steelcase</u> may also be considered plaintiff's "employer" for purposes of suit. In response to that issue, plaintiff borrows the "joint employer" test from the preceding jurisprudence, and asserts it as a basis for finding that Steelcase <u>was</u> her "employer," along with Martin.[58]

An entity that is not the plaintiff's employer-in-fact still may be held liable for violations of Title VII under the "joint employer" theory when it,

> while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the

---

[58] *See* plaintiff's response to defendant's motion for summary judgment (doc. no. 51), at 5. Note that plaintiff's counsel indiscriminately mixes the "single employer" (or "integrated enterprise") test with the conceptually distinct "joint employer" test: *i.e.*, "Ward would submit that <u>rather than utilizing the single employer doctrine</u>, the appropriate theory lies within the integrated <u>interprise</u> [sic] doctrine or joint employer relationship." *Id.* (emphasis supplied). Regarding this conceptual confusion of counsel, see the discussion *infra* note 59.

In any event, Steelcase asserts that plaintiff cannot establish that it was her "employer" regardless of whether the "single" or "joint employer" test is applied to the facts. *See* Steelcase's brief in support of its motion for summary judgment (doc. no. 44), at 14-18.

23

> employees who are employed by the other employer.  Thus
> the joint employer concept recognizes that the business
> entities involved are in fact separate but that they
> share or co-determine those matters governing the
> essential terms and conditions of employment.

*Virgo*, 30 F.3d at 1360 (quoting *National Labor Relations Board v.*

*Browning-Ferris Industries*, 691 F.2d 1117, 1123 (3d Cir. 1982)[59]).

This always is a fact- and case-specific inquiry, and several

factors may be considered when determining whether an entity

"share[s] or co-determine[s] those matters governing the essential

terms and conditions of employment." *Virgo*, 30 F.3d at 1360.  For

example, courts have considered whether the alleged joint employer:

determined the employee's compensation; shared the right to hire

and fire the employee; supervised the employee on a day-to-day

basis; considered itself a "boss" with respect to the employee's

job functions; established the work hours of the employee; provided

the employee the same uniforms given its own employees; and,

---

[59] As the Eleventh Circuit observed in Virgo v. Riviera Beach Associates,
Ltd., 30 F.3d 1350 (11th 1994):

> Courts predominantly apply the standards promulgated by the
> National Labor Relations Board when deciding whether two entities
> should be treated as a joint employer. *McKenzie v. Davenport-Harris
> Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987).  A "joint
> employer" relationship is different from, though sometimes confused
> with, a "single employer" situation.  *Clinton's Ditch Coop. Co. v.
> National Labor Relations Bd.*, 778 F.2d 132, 137 (2d Cir. 1985)
> (identifying the distinctions between these two types of
> situations), *cert. denied*, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25
> (1986).  ...

*Id.* at 1359-60 n.6.

24

directed the employee as if he or she were its own.   *See, e.g.,*
*Browning-Ferris*, 691 F.2d at 1124-1125.

The essential facts of Steelcase's relationship to plaintiff
are not disputed, and they weigh <u>heavily</u> in favor of a finding that
Steelcase was <u>not</u> a "joint employer" of plaintiff.

First, plaintiff urges that Steelcase must be considered a
joint employer due to the provisions of the defendants' March 21,
1994 "memorandum of agreement,"  which specified the shifts and
weekdays Martin was required to staff its supply crib, and required
Steelcase to pay Martin an annualized contract fee of $62,500 for
"2.5" (or half) of the 5 persons employed by Martin to staff the
crib.[60]  However, that contract only provided that the crib would
be staffed by Martin on the first and third shifts, Monday through
Friday, and on Saturdays as required by Steelcase.[61]  Obviously,
that provision does not set the specific hours that plaintiff was
required to work.[62]  Further, the fact that Steelcase paid Martin
an annualized fee to off-set Martin's costs of operating and
staffing the supply crib does not render Steelcase a joint
employer.  Plaintiff has presented no evidence that <u>she</u> was paid by

---

[60] See note 13 and related text *supra*.

[61] See note 12 and related text *supra*.

[62] Defendant's evidentiary submission (doc. no. 40), Exhibit 7 (Locke affidavit), ¶ 6 (asserting that Martin scheduled plaintiff's specific workhours).

Steelcase, or that Steelcase determined her rate of pay.   The evidence establishes that Martin, alone, had the power to determine plaintiff's salary.[63]   Moreover, as observed earlier, plaintiff received her paychecks, W-2 forms, and health insurance coverage through "Skilstaff, Incorporated": an employee leasing agency with which Martin, not Steelcase, had contracted.   Thus, plaintiff's reliance on the provisions of the March 1994 contract is not persuasive.

Other courts have found that provisions in contractual arrangements between business entities, similar to the one existing between Martin and Steelcase, were insufficient to establish joint employer status.   *See, e.g., Zinn v. McKune*, 143 F.3d 1353, 1358 (10th Cir. 1998) (where a contractual arrangement provided that the first entity [Department of Corrections] would pay or reimburse the second [Prison Health Services ("PHS")] for services provided by PHS personnel, but PHS maintained the ultimate responsibility to pay wages, benefits, and salaries to its employees, the terms of the contract would not render the Department of Corrections an "employer" of plaintiff, who was an employee-in-fact of PHS); *Rivas v. Federacion Pecurias*, 929 F.2d 814, 820 (1st Cir. 1991) (despite

---

[63] Plaintiff's evidentiary submission (doc. no. 41), Exhibit 2 (Ruggles deposition), at 34.

a contractual arrangement whereby a putative employer agreed to reimburse the employer-in-fact for the wages of its employees, no finding of joint employment was warranted because the putative employer did not exercise sufficient control over plaintiff); *Martin v. Purolator Courier*, No. 94 CV 1004, 1996 WL 429016 at *4 (E.D.N.Y. July 25, 1996) (contractual arrangement whereby one entity agreed to reimburse second entity for "all labor costs" provided by the second entity's personnel "does not transmute to the requisite control over" those employees to establish that a putative employer is a "joint employer").

The evidence also reveals that Steelcase did not have the power to hire or fire plaintiff. Plaintiff testified that she was hired by Martin in or around October of 1992.[64] The undisputed evidence reveals that Martin management made the decision to transfer her from the Steelcase facility, and that Steelcase had no power to terminate her employment.[65]   Even if, as plaintiff contends, Greg Hall suggested to Ruggles that plaintiff be replaced, the ability to make such a request to Martin does not translate into the power to hire or fire plaintiff, or any other Martin employees working in the crib. *See Zinn*, 143 F.3d at 1358

---

[64] *Id.* Exhibit 1 (plaintiff deposition), at 405.

[65] *Id.* Exhibit 2 (Ruggles deposition), at 87, 92; Defendant's evidentiary submission (doc. no. 40), Exhibit 7 (Locke affidavit), ¶ 5-6.

("Though the Department [of Corrections] retains the right to request removal of PHS personnel with whom it is dissatisfied, ... PHS alone exercise[d] control over the hiring and firing of PHS personnel.").

Plaintiff also testified that she regularly reported to Martin's Vice President, Doug Ruggles, by sending him "report[s] or ... update[s] of the weekly happenings" at the crib.[66] Further, the undisputed testimony of Greg Hall, Steelcase's liaison with Martin, indicates that he had minimal daily interaction with Martin's crib employees, that he never held formal "meetings" with them, and (with the exception of minimal training of crib employees on Steelcase's computer systems) he did not train plaintiff in any aspects of her job.[67] It should not be overlooked that plaintiff possessed great autonomy, and testified that if Steelcase made requests, she had the discretion to consent to such.[68] Finally, unlike individuals who are employees-in-fact of Steelcase, plaintiff received no formal evaluations from anyone at Steelcase.

In short, the evidence clearly establishes that no one at Steelcase trained plaintiff, supervised her on a daily basis,

---

[66] Plaintiff's evidentiary submission (doc. no. 41), Exhibit 1 (plaintiff deposition), at 435.

[67] Id. Exhibit 7 (Hall II deposition), at 72-73.

[68] Id. Exhibit 1 (plaintiff deposition), at 436

evaluated her performance, considered themselves her "boss," or possessed the authority to fire her.   *Cf. Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998) (a supervisor is one who can hire, fire, demote, promote, or discipline the plaintiff).

Plaintiff nevertheless points to one incident which, she argues, demonstrates that Steelcase management exercised supervisory power over her.   Plaintiff's son also was employed by Martin for an unspecified period of time, during which he worked in the supply crib with his mother.   Following the boy's arrest on state criminal charges, Greg Hall asked plaintiff "to remove [her son] from the plant site."[69]  Plaintiff testified that she "actually felt like [Hall] was showing [her] that [she] was his employee and he was giving [her] instructions on how [she] should handle [her crib] employees."[70]  Plaintiff's "feeling" notwithstanding, the evidence indicates otherwise; Hall's request was just that, a request.   Plaintiff has offered no evidence establishing that she was compelled to accede to Hall's request, or that she could be disciplined by Steelcase management for insubordination if she failed to do so.   In fact, plaintiff testified that "[a]ny

---

[69] *Id.* at 261.

[70] *Id.* at 262.

decision, except money decisions, were mine to make as far as a request or demand from Steelcase."[71]   Moreover, plaintiff's subjective perceptions of the nature of Hall's request are irrelevant.   "The joint employer issue does not turn on the perceptions of the employee since employee control is primarily a function of the objective relationship and understandings of the affected employers." *Martin v. Purolator Courier*, No. 94 CV 1004, 1996 WL 429016 at *4 (E.D.N.Y. July 25, 1996).

Finally, plaintiff argues that Steelcase was her joint employer because crib employees had to request permission of Steelcase employees before leaving the premises.[72]   At her deposition, plaintiff did not elaborate on this allegation, or explain whether it was merely incidental to the provision in the defendants' 1994 contract regarding the required staffing of the crib.   Even so, all other factors weigh in favor of finding that Steelcase was not plaintiff's "employer."   Accordingly, Steelcase's motion for summary judgment is due to be granted on that jurisdictional basis alone.

Even if Steelcase were deemed to be plaintiff's joint employer, this court still would grant summary judgment for the

---

[71] *Id.* at 433.

[72] *Id.* at 434.

reasons asserted in Steelcase's brief.[73]

This court acknowledges that the remarks attributed to Long evidence an animus against working women in general, and animosity against plaintiff in particular. There nevertheless are insurmountable problems with plaintiff's proof. First, most of the incidents complained of fell outside the 180 day period preceding the filing of her charge of discrimination with the Equal Employment Opportunity Commission. *See, e.g., Taylor v. Hudson Pulp & Paper Corp.*, 788 F.2d 1455, 1458 (11th Cir. 1986) ("[O]nly claims arising within 180 days prior to filing of charges with the EEOC are actionable...."), *cert. denied*, 484 U.S. 953, 108 S.Ct. 345, 98 L.Ed.2d 371 (1987).

Second, those incidents cannot be linked under a continuing violation theory to the events which did occur within the 180 days leading up to plaintiff's EEOC charge[74] for several reasons. The

---

[73] Steelcase's memorandum in support of motion for summary judgment (doc. no. 44).

[74] The two incidents which plaintiff could specifically articulate as occurring within the 180 day period leading up to February 23, 1998 — the date she filed her charge of discrimination — include the following:

1)   On September 20, 1997, Long hinted that plaintiff was going to be removed from the supply crib, and that he would replace crib employees with individuals of his choosing; and,

2)   Ten days later, Jerry Shindorf discussed with plaintiff comments she had allegedly made about Long. Plaintiff denied making any such comments, and told Shindorf that she was "uncomfortable" with the accusations.

Plaintiff's evidentiary submission (doc. no. 41), Exhibit 1 (plaintiff

Eleventh Circuit holds that the continuing violation theory allows incidents to be considered a single violation <u>only</u> when there is a "substantial nexus" between the conduct that occurred prior to and after the 180 day period.  *Roberts v. Gadsden Memorial Hospital,* 835 F.2d 793, 800 (11th Cir. 1988).

> In determining the existence ... of such a nexus, a court ... should refer to a variety of factors.  Such factors include whether the claims were related in subject matter, frequency, and permanence (i.e., whether the act was sufficiently permanent in nature so as to trigger an employee's awareness of and duty to assert his or her rights).  ...

*Id.* (internal quotation marks omitted).  The two timely events[75] do not appear to be related in subject matter to Long's previous, blatant, gender-based remarks.  Moreover, the timely events do not appear to relate to plaintiff's gender and, hence, do not provide a "sufficient anchor allegation of sexual harassment."  *Speer v. Rand McNally & Company,* 123 F.3d 658, 664 (7th Cir. 1997).  The evidence also reflects that there was no true frequency between the timely and untimely incidents.  Plaintiff specifically identified approximately eleven incidents of perceived harassment over a five year period.  Even a generous reading of the record reflects that approximately one year elapsed between the incidents constituting

---

deposition), at 229, 290.

[75] See preceding footnote.

plaintiff's timely claims, and her most recent, time-barred ones.[76]

Finally, even if all incidents of alleged harassment could be linked under a continuing violation theory, plaintiff still would have great difficulty showing that the conduct was sufficiently severe or pervasive to support her hostile work environment claim. *See, e.g., Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*).

**B.   Plaintiff's Motion for Partial Summary Judgment Against Martin**

    **1.   Plaintiff's discriminatory demotion claim**

With respect to plaintiff's motion for summary judgment on her discriminatory demotion claim, it is appropriate to note at the outset of discussion the weighty burden that must be borne by a plaintiff hoping to succeed on a such a motion.

> Plaintiffs ... can move for summary judgment, but this is unusual. ... [T]he burden of proving discrimination falls on the plaintiff. To obtain summary judgment in a typical disparate treatment case, therefore, a plaintiff would have to prove that there existed no genuine issue of material fact (1) that the defendant did indeed have a discriminatory motive, and (2) to defeat a mixed-motive defense, that the defendant, absent discrimination would not have made the employment decision at issue. ... Employers, on the other hand, need only point to the absence of a triable question on one element of plaintiff's proof.

---

[76] *See, e.g.*, defendant's evidentiary submission (doc. no. 40) Exhibit 1 (handwritten notes attached as exhibits to plaintiff's deposition).

2 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 1464 n.22 (3d ed. 1996) (emphasis added).

Three forms of proof may be used to establish an employer's intent to discriminate:  (1) statistical proof of a pattern of discrimination[77]; (2) direct evidence of a discriminatory animus[78]; or (3) circumstantial evidence.  The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon which form of proof is used.  Plaintiff has offered neither statistical nor direct evidence indicating that Martin intended to discriminate when transferring her.  Therefore, the court will analyze her claim as one based on circumstantial proof.

When evaluating employment discrimination claims supported by circumstantial evidence, courts are guided by the now familiar analytical framework the Supreme Court announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973), and then elaborated in its progeny.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  Under that framework,

---

[77] *See, e.g.*, Wilson v. AAA Plumbing Pottery Corp., 34 F.3d 1024, 1027 (11th Cir. 1994).

[78] *See, e.g.*, Carter v. City of Miami, 870 F.2d 578, 581-82 (11th Cir. 1989).

the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If a plaintiff does so, then at the second stage of analysis the burden of production shifts to the defendant to rebut the presumption of intentional discrimination thus created by articulating legitimate, nondiscriminatory reasons for the contested employment action.  *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.  If a defendant carries its burden, then in the final step of inquiry the plaintiff must have an opportunity to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 685, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998).

To establish a prima facie case of discriminatory demotion, a plaintiff must show that:  (1) she is a member of a class of persons protected by Title VII; (2) she was qualified for the position she formerly held; (3) she was demoted; and, (4) she was

35

replaced by an equally or less qualified person outside her protected class. *See, e.g., Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1432 (11th Cir. 1998) (ADEA claim); *Nowlin v. Jones Intercable, Inc.,* 102 F. Supp. 2d 1364, 1371 (S.D. Ga. 2000) (Title VII claim). Here, plaintiff has established a prima facie case of discriminatory demotion. She is a female who held the position of crib manager for Martin at its Steelcase facility for approximately five years, which indicates that she was clearly qualified for the position. She was demoted, and replaced by a male.[79]

Viewing the evidence pertaining to plaintiff's demotion in the light most favorable to Martin, however, reveals genuine issues of material fact with respect to whether defendant exhibited a discriminatory animus. Ruggles testified that he removed plaintiff from the Steelcase facility in order to "separate" her from Long,[80] and that his first choice for plaintiff's replacement was another female Martin employee, Barbara Dunn, but Dunn was too deeply involved in a project at the Trico facility (where she was constructing a data base) to move her at that time.[81] Therefore, summary judgment is inappropriate. *See generally Thornbrough v.*

---

[79] Plaintiff's evidentiary submission (doc. no. 41), Exhibit 2 (Ruggles deposition), at 82.

[80] *Id.*

[81] *Id.* at 113.

*Columbus & Greenville Railroad*, 760 F.2d 633, 640 (5th Cir. 1985)
("In general, summary judgment is an inappropriate tool for
resolving claims of employment discrimination, which involve
nebulous questions of motivation and intent.").

### 2.   Plaintiff's hostile work environment claim

Title VII of the Civil Rights Act of 1964 "prohibits
employment discrimination on the basis of gender, and seeks to
remove arbitrary barriers to sexual equality at the workplace with
respect to 'compensation, terms, conditions, or privileges of
employment.'"  *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th
Cir. 1981) (citations omitted).  EEOC interpretative guidelines
provide that "[u]nwelcome sexual advances, requests for sexual
favors, and other verbal or physical conduct of a sexual nature
constitutes sexual harassment when ... such conduct has the purpose
or effect of unreasonably interfering with an individual's work
performance or creating an intimidating, hostile, or offensive
working environment."  29 C.F.R. § 1604.11(a).

To establish a prima facie case for hostile work environment
sexual harassment, an employee must show that: (1) she belongs to
a protected class; (2) she has been subjected to unwelcome
harassment; (3) the harassment complained of was based upon her
sex; (4) the harassment complained of was sufficiently severe or

37

pervasive to alter the terms and conditions of employment and create an abusive working environment; and (5) a basis for holding the employer liable.  *See, e.g., Mendoza*, 195 F.3d at 1245; *Henson*, 682 F.2d at 903-905.

Plaintiff obviously satisfies the first element.  Viewing the evidence in a light most favorable to Martin, however, indicates that there are genuine issues of material fact regarding whether plaintiff was subjected to harassment.  Long testified that he made only one comment to plaintiff which could be deemed sexist.  He admitted that in 1993 he commented, "in a joking way," "you can't get a woman to do a man's job."[82]  Long insists he never again made similar comments to plaintiff.[83]  Therefore, this issue of material fact with respect to the second element of this claim renders summary judgment inappropriate.

Moreover, the fourth element of a prima facie hostile work environment claim serves to emphasize two interrelated principles: sexual harassment becomes actionable under Title VII <u>only when</u> it alters the terms, conditions, or privileges of employment; and, harassment alters the terms, conditions, or privileges of employment <u>only when</u> it is demonstrably severe or pervasive.

---

[82] *Id*. Exhibit 14 (Long deposition), at 41.

[83] *Id*. at 43.

*Meritor Savings Bank*, 477 U.S. at 67, 106 S.Ct. at 2405 ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII. ... For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.").

Indeed, even though Title VII's prohibition against sex discrimination unequivocally includes sexual harassment, Title VII still is not a "general [federal] civility code," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1988). Neither the Supreme Court nor the Eleventh Circuit has ever held "that workplace harassment ... is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1000-02, 140 L.Ed.2d 201 (1998); *see also Mendoza*, 195 F.3d at 1245.

Rather, "[a] recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788,

118 S.Ct. at 2283 (internal citation omitted); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment."); *DeAngelis v. El Paso Municipal Police Officers Association*, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."). The "mere utterance" of sexually explicit epithets and derogatory statements "which engender offensive feelings in an employee" is <u>not</u> actionable. *Meritor Savings Bank*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)). That is because "Title VII does not attempt to purge the workplace of vulgarity," *Hopkins v. Baltimore Gas and Electric Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (internal quotation marks and citation omitted), nor did Congress "expect employers to purify the language in the workplace or remove all vulgarity or coarse comments."

*Johnson v. Hondo, Inc.*, 940 F. Supp. 1403, 1410 (E.D. Wis. 1996).

Thus, the fourth element of a prima facie case

> is the element that tests the mettle of most sexual
> harassment claims.  Requiring the plaintiff to prove that
> the harassment is severe or pervasive ensures that Title
> VII does not become a mere "general civility code."
> *Faragher v. City of Boca Raton*, 524 U.S 775, 788, 118
> S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1988).  This
> requirement is regarded "as crucial, and as sufficient to
> ensure that courts and juries do not mistake ordinary
> socializing in the workplace — such a male-on-male
> horseplay or intersexual flirtation — for discriminatory
> 'conditions of employment.'" *Oncale v. Sundowner Offshore
> Services, Inc.* 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140
> L.Ed.2d 201 (1998).

*Gupta*, 212 F.3d at 583.

Of the approximately eleven incidents that plaintiff identified as occurring over a five year period, many do not appear to be based upon her gender and, of those that clearly are so based, the court believes that plaintiff bears the laboring oar of persuading a jury that they are sufficiently severe or pervasive as to be actionable under Title VII.  For this reason, and the others discussed above, plaintiff's motion for partial summary judgment on her hostile environment claim is due to be denied.[84]

---

[84] With respect to the fifth element — which requires that plaintiff establish a basis for holding her employer liable — the court notes that Long was an employee of Steelcase.  This fact alone, however, is not fatal to plaintiff's case against Martin.  The Eleventh Circuit has recognized that, "[t]he environment in which an employee works can be rendered offensive in an equal degree by the acts of supervisors, coworkers, or even strangers to the workplace."  *Henson*, 682 F.2d at 910 (emphasis added).

## IV. CONCLUSION

For the foregoing reasons, this court concludes that Steelcase's motion for summary judgment is due to be granted, and plaintiff's motion for partial summary judgment is due to be denied. An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this _26th_ day of February, 2001.

_____
United States District Judge

---

> When an employee's ability to perform his or her job is compromised by discriminatory acts including sexual harassment and the employer knows it, it is the employer that has the ability, and therefore the responsibility, to address the problem, whether the harasser is a supervisor, a co-worker, a <u>client</u>, or a subordinate.

*Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir. 1999) (emphasis added). This view is consistent with Equal Employment Opportunity Commission Guidelines which state:

> An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer ... knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

29 C.F.R. § 1604.11(e).

The only member of Martin management that plaintiff ever complained to is her supervisor, Doug Ruggles. Ruggles admitted that plaintiff complained to him, on at least one occasion, that Long had commented to her that women should not be in the workplace. Plaintiff's evidentiary submission (doc. no. 41), Exhibit 2 (Ruggles deposition), at 51-52, 58. However, the court need not reach the issue of whether plaintiff's complaints were sufficient to put Ruggles on notice that corrective action may have been warranted, as it believes that the conduct complained of was neither sufficiently severe nor pervasive as to alter the terms and conditions of plaintiff's employment.

42